2-15-0265 Thomas Swoboda v. Board of Trustees Village of Sugar Grove Police Pension Fund and the Village of Sugar Grove and Municipal Corporation Defendants' Appellees Argument on behalf of Plaintiff O'Connor, Attorney Mr. Craig S. Leal Argument on behalf of Defendants' Appellees, Attorney Ms. Ellen L. Green Also arguing on behalf of the Defendants' Appellees, Attorney Mr. Keith A. Carlson Is it Mielke? Mielke. Mielke? If you're ready, you may proceed. Thank you. May it please the Court, Craig Mielke on behalf of Disabled Officer Thomas Swoboda. I introduce my client by saying Disabled Officer because that fact, legal conclusion is undisputed. All three of the Pension Board exams certified Officer Swoboda as disabled. The issue here is whether or not that disability was the result of an act of duty. And of course, act of duty is a statutory phrase which is defined in the Pension Code specifically as any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in ordinary walks of life imposed on a policeman by the statute of this state or by any ordinance or police regulation of the city in which this article is in effect. Counsel, when the officer was injured, what duty was he discharging? And what capacity, in other words, was he acting when he injured himself? Absolutely. He was doing a annual physical fitness exam, which is allowed by the collective bargaining agreement and equates to his job description, which requires heavy lifting, and is the specific act he was doing at the time, bench pressing, is equivalent to the so-called power test, which officers in the state of Illinois do in order to graduate the academy. The physical fitness exam was done in the direction of the chief of police, who formulated the nuts and bolts of the exam and was implemented by Sergeant Barna, acting on behalf of the chief. How did this involve any special risk? The special risk, I think, is multiple in this case. First, bench pressing 75% of one's body weight, I think, in and of itself is a special risk. Well, certainly it would be for me, but we're talking about police officers who have this as part of their job description, so to speak. So how is it a special risk? I think it's because of the way in which, well, first, I think lifting, bench pressing 75% of your body weight is a special risk. And I appreciate what the court just said. But the way in which this test is done creates an additional special risk. The officer does a single bench press, a single power lift. They are not allowed, and this is in the record, they are not allowed to warm up. They are not given access to exercise facilities. And the specific test is done without even the benefit of a bathroom scale. The testimony is that the officer tells, I think it was Sergeant Barna or Officer Bruno who's doing the exam, this is how much I weigh. The other officer then says, okay, the 75% of that is this much and starts loading weights on the bar. How much did he weigh? I think the record is he weighed 215 or 225. I thought the rule was that it was 75% up to 175 pounds. That is the rule. The testimony on that is that Officer Svoboda himself stated he thought he lifted about 200 pounds. Why is he lifting 200 pounds? Isn't that a discretionary act? No. Well, why would anyone lift over 175 if they didn't have to? Officer Svoboda did not decide how much he was going to lift. There is nothing in the record that says he decided how much he was to lift. He would have told, I believe it's Sergeant Barna, how much he weighs, and then Sergeant Barna does the calculation and loads the bar. So are you saying that the record reflects that he was given a weight beyond what the requirement was? Well, this is the testimony. I'm confusing Sergeant Barna with Officer Bruno. Officer Bruno conducted the exam, and Officer Bruno testified. For each participant's body weight, I could not locate a scale in the weight room or the attached storage room. Each participant was asked what their body weight was and bench pressed 75% of it on the same machine that was used last year. That's how it was done. Well, don't citizens in the ordinary walks of life actually do that? I mean, how many people don't warm up before they go ahead? How many people might gather and challenge one another to a single lift? I mean, isn't this something that happens? No, and here's why. Because the statutory phrase is not what do ordinary citizens do. It's ordinary citizens in ordinary – I'm sorry, it's a citizen in the ordinary walk of life. Walk of life has a particular meaning. Walk of life is not simply what we might do on our recreational activity or what we might do on a dare from someone else. Well, what is your authority for that? Why wouldn't it include recreational activities? Walk of life, as we indicate and we give a Cambridge Dictionary definition, is a job, a vocation. And I think it certainly makes sense in statutory construction. If we're looking at a pension statute where we're talking about whether something is an active duty, whether it's a job related for the police officer, the comparison is not going to be to a bunch of muscle men on the beach or at the health club, but rather citizens in ordinary walks of life. And no one has identified a vocation, a job, that requires bench pressing 75% of one's body weight. This is not like the Summers case with the city of Chicago police officer, where the police officer in that case was essentially assigned the job of being a delivery man and admittedly did heavy lifting, but heavy lifting of a delivery man, whether you're FedEx or UPS or the U.S. Post Office, is not the same as doing a single bench press for 75% of your body weight. I mean, I've never seen the UPS man at our office come in and lay down on his back and bench press a package. And certainly lifting a package this way is different mechanically and different in your body from laying on your back and bench pressing upwards. And it's the mechanism of the injury is doing the bench press. It uses different parts of your shoulder, and doing this with weight is different than picking up weight from the floor and putting it onto a table or something of that sort. There are cases that, as you said, talk about walks of life in the context of an occupation. There are also cases that talk about walks of life in just everyday activities of people, not necessarily related to their occupation, correct? There is no published case directly dealing with bench pressing. I'm talking about other, I mean, you're arguing that walks of life means we look at other occupations and nothing else. We don't look at just ordinary citizens out recreating. Well, yeah, and I think the case that's most instructive on that is the Sarkis, S-A-R-K-I-S, Sarkis v. Desplaines case. And that's an interesting fact situation. The background appears to be that the railroad that runs through the city or village of Desplaines has some bad gates which apparently get stuck in the down position on a regular basis. And the evidence in Sarkis was that there was a specific deputized group of citizens who were allowed to raise the gates on their own when they got stuck. And I think most importantly, the evidence was that even regular citizens would get out of their cars and go lift those gates on occasion. So there you have specific evidence that the actual conduct, and Officer Sarkis apparently lifted one of these gates and injured himself, that the specific actual activity was done by citizens in their ordinary activity. But that was not in their walks of life. I mean, if I'm going to work in the morning and the railroad gate is stuck and I get out and go lift that gate, I'm not doing that as part of my occupation or vocation. That's not part of my walk of life to be lifting railroad gates. I think it is for the police officer is that he has to do that. He has to assist that. And the fact that other citizens may do that physical activity, even if it's the exact same physical activity, I think that's the ultimate holding of Sarkis, that the fact that a citizen may do the exact precise activity does not mean that it's not a special risk ordinarily assumed by a citizen in the ordinary walk of life. And I think that's the distinction that the statute attempts to draw. And I think that's clearly the holding in Sarkis. Well, couldn't the phrase citizen in the ordinary walks of life really also be interpreted or alternatively be interpreted to simply distinguish the civilian population from police officers? Well, then it could just end up ordinarily assumed by a civilian, period. But it's a citizen or a civilian. I interpret citizen as being a civilian. And it's qualified by in the ordinary walk of life. I think there's, you know, the fact, again, the Johnson case from the Supreme Court talks about that's the one where the officer is, I think, walking across an intersection or across the street. To investigate an accident. Yeah. But he's doing a very ordinary activity, just walking across the street. I think he slips on slippery pavement. You know, obviously we all face that risk of slipping on slippery pavement as we cross the street. And the Supreme Court said you don't really focus on the precise mechanism of the injury. It's more on, I think, as your initial question was, what is really, what's he doing? Is he acting as a police officer or is he being the delivery boy, as in Summers? Here, it's an officer doing the annual fitness exam, which is specifically mentioned in the collective bargaining agreement, specifically ordered by the chief, and it's done in a way to parallel or mimic the power test that the officers do in the academy. And it's done to ensure that the police officers can perform their job as police officers, which require heavy lifting. Even if we accept your representation or your analysis that walks of life means occupational, we do have in the record that the NFL has weight training standards. And that is not the only one. That's the only one in the record. But I think we can all take judicial notice that we see athletes on a regular basis going through certain lifting and running and things of this nature. And it's part of their employment, I suppose. But what is the risk, I guess? If you look to the statute, it's citizens, not just citizens in walks of life. We're not just saying citizens performing their jobs. It's citizens in ordinary walks of life. I would say the athletes are extraordinary, extraordinary. They are beyond the ordinary. So I don't think the fact that athletes perform weight lifting as a professional. Arnold Schwarzenegger, I guess, is a good example. Before he was a movie star, before he was a governor, I think he was a professional weight lifter. I don't think anybody would say Arnold Schwarzenegger was in an ordinary vocation when he was this muscle-bound weight lifter. And I think that's the distinction here. Ordinary walks of life do not include this type of annual physical test of a single bench press of such heavy weight without adequate preparation, without proper scales and knowing. And I think that's a problem you pointed out. Why was he lifting as much as he did? He estimated in his testimony, and we know how the system was done. Certainly there's no indication that he passed the minimum test and then as a matter of showing off or something else decided, okay, let's see now how much I can really do. I think that's a different situation. It's not like he passed the test and then said, you know, I'm going to bet you a beer if I can bench press 25 or 50 pounds more. When we look at what is a special risk, you try to make some rhyme or reason out of all these cases. And it seems like whenever the officer is on patrol, on duty, doing something, you know, for the protection of the public, those have been found to be acts of duty. When somebody is maybe still on the clock, but necessarily not doing anything for the protection of the public. For instance, Fedorsky driving back to the station after completing an assignment. Phil Scuff entering a squad car, even though on duty, getting into the squad car to start patrolling, but not actually patrolling. Then you go to Jones and Rose where the officer is actually on duty and involved in an accident while patrolling. And if we're trying to draw some rhyme or reason, which maybe there isn't a way to draw rhyme or reason, I don't know. But that seems to be what's pointed out in Summers. Here the officer is not on patrol. The officer is not protecting the public. The officer is performing a policy. But I believe in Summers, and I think there's other cases, I suppose you wouldn't be here if there was this bright line that you're either on patrol or you're not. And if you're on patrol, then you qualify. If you're not on patrol, then it doesn't count. But the appellate cases, and I believe Summers is one that comes to mind, specifically state, and I think there's other cases that concur, that protecting the public is not the only way you can qualify for a line of duty disability pension. So that bright line is just not there. I suppose we can make an argument a lot of ways why maybe it should be or why it shouldn't be there. Certainly there's many things police officers do. And I think training, in my mind, is one of them where you're mimicking, you know, the real life. And it is an active duty to be doing police training. Ordinary citizens don't. But, I mean, let's say this was something that was being done on a firing range where there's live fire going back and forth. And a police officer takes a bullet, but it's a training exercise. I think that might be a lot easier case than what we have here. But I think we might all agree that if he took an arrow and pulled it on a live firing range, that would be an active duty. Here it's not live fire, but it's lifting a very heavy amount of weight that's done specifically by collective bargaining agreement per the job description and to mimic the power test that they all do when they graduate from the academy. Go ahead. Well, if this is pursuant to the collective bargaining agreement or allowed by the collective bargaining agreement, why aren't there the police officers and their representatives participating in that? If it is such a special risk, if it is such a dangerous situation, why haven't they tried to resolve that through that mechanism? Well, they don't do it anymore. I think that's a good answer. And it's been resolved. That's the fact, yes. They're not doing it anymore. And I would say a lot of departments don't do this because people get hurt doing these annual physical exams. Does it matter as to whether or not it was mandatory that this was done? I think it helps if it's mandatory because that makes it more of an active duty as opposed to just a volunteer activity. And here the sergeant ordered it through an e-mail. It was issued by Sergeant Barna. And then as part of the record, after the incident, Sergeant Barna did the standard incident report. And it's his word, not mine. He says, Officer Sloboda was injured during the mandatory fitness exam. So I think it's... But there was no finding made by the board, right, with regard to that? There was no finding made either way by the board on the mandatory issue. Yeah, I think we've all seen what I'm going to call the Riemer and Carlson findings of fact in police pension decisions. And they do a very nice job where they list out 30, 40, 50 specific findings of fact, which are never exhaustive. And then they reach their conclusions, et cetera. So if we look at the decision in this case under the heading findings of fact, we're not going to see a finding one way or the other on mandatory. If you could summarize, you'll have an opportunity for Obama to choose. Again, I just... Because of the lack of guidance and published decisions, I think we go back to the statute. And the hallmarks of the statute are any act of police duty with the special risk and that's not assumed in the ordinary walks of life. And I think when we go back to the statute, this situation hits all three of the requirements. It was an act of duty because he was ordered to do so. It was part of the collective bargaining agreement. And it fits the job description. It fits the power test. The special risk to me is just obvious as a matter of common sense weightlifting this amount. And then it's not in the ordinary walks of life for the reasons we've discussed. Thank you. Mr. Carlson. Good morning. May it please the court. My name is Keith Carlson. I represent one of the defendants of the Sugar Grove Police Pension Board. And also the record should reflect also Alan Green is here on behalf of the village of Sugar Grove. And she may take some of the time at the end depending on how things go as far as my answering of your questions. In large part it seems that Mr. Milkey's arguments seem to focus on the term ordinary walk of life, special duty, or special risk, as well as active duty. And to interpret the pension code in the manner urged by the plaintiff here would start to not just blur the line between active duty and on duty. It would eliminate it. Well, he was, I'm assuming that this test is going on during the course of his employment day. He's not doing this on a day off, is he? That's correct. All right. And he's doing it on an active day because it has been ordered by his sergeant who also took information or took direction from the chief. The mandatory nature of the test is at best disputed in the record. Officer Bruno, who testified as the president of the union, kind of went back and forth on the mandatory nature of it. He said, yeah, we're supposed to do it. They're allowed to do it under the collective bargaining agreement. There's an email with the prior union president, Mr. Springborn, that says that nobody would be disciplined. There's no additional rules or regulations or anything that comes in after that indicating that the officers would be disciplined. The contract itself between the union and the municipality, to which it's important to note the pension board is not a party to, and it is an independent body politic as opposed to the municipality. But the CBA itself says discipline is not the first stop on the railroad, that first they have to give an opportunity to be able to meet the standards through some sort of alternative process. So even under the CBA and then the vacuum that occurs after the 2010 email to Springborn, there is no indication that anybody was going to be disciplined for failure of these tests. But nothing changes the facts here, and the facts indicate that the union president who was running the test allowed this to occur, maybe. But it doesn't ever say that Bruno is the one who determined the weight to be lifted. And as Justice Burke already emphasized, he lifted more than he was required to. He was required to lift a maximum of 175 pounds. If his weight was 220, as he reported during his testimony, then the maximum amount he should have lifted would have been 165. Any amount above that was discretionary. Now, Mr. Whose discretion? The officer. The officer was not required to ever lift that amount of weight. So he was supposed to say to his sergeant, who I think is there, putting on the weights. I don't believe the sergeant was there during the administration. He was helping Officer Bruno do the administration. The applicant. So he put his own weights on. The record is unclear who actually put the weights on. That was not developed by the applicant who has the burden. Now, with regard to special risk, to assert that it's common sense that there's special risk is not something this court can take judicial notice of. There is absolutely zero medical evidence demonstrating that lifting in the manner as was done here increased any sort of risk beyond that encountered by a normal individual who chooses to lift weights on their own. In addition, as you noted, NFL players are not the only people with physical fitness requirements. In addition to that, athletes aren't the only ones. There are many occupations in the civilian world that require minimum lifting requirements. Look at any workers' compensation case. They will talk about what the functional capacity for each occupation is. Is it a light lifting? A heavy lifting? Is there a lifting limitation? Are you allowed to lift more than 20? Are you allowed to lift more than 50? And in many of those circumstances, they require if an injured employee wants to come back to work, they have to demonstrate physically that they're able to lift more than that. But 75% of their body weight? I don't know. There's nothing in the record demonstrating that regular civilians don't have that. And again, the burden is on the applicant, on the plaintiff to demonstrate that they have some sort of special risk. What's more, the mandatory nature of the test, even if it were mandatory, which the record is unclear at best, meaning that the factual determinations by the board are entitled to full deference. Because Mr. Bruno's testimony kind of goes both ways, where he talks about it's mandatory, but there may not be discipline. We don't know what happens. We don't know who put the weight on. We don't know if he determined to lift more than the 165 pounds he would have been required to. The board never made a finding regarding whether it was mandatory or not. Because the board's position is that it's largely irrelevant whether or not it's mandatory. I understand that. You have a number of different elements here. If you fail on one, you fail on the whole thing. Correct. And they went to special risk and said normal people lift weights. Correct. So they never got to mandatory nature. Absolutely. That is correct. That's why they never did get there. But we can't get deference to their factual finding regarding mandatory nature because they never made a factual finding. But the conclusion is also based partially upon that. And it certainly is indicated in the record itself would support that determination. And we're not limited solely based upon the words that they chose to select in their decision and order. You have to look at the record as a whole. And if there are facts in there that lead to affirmance of the pension board's decision, then those facts should be considered as well. The fact that... Excuse me. Why was this not a special risk if this requirement was tied specifically to the requirements of being able to execute the duties of a police officer? That is, chasing suspects, wrestling with people, the physical aspects of the job. Because it's so tangential to those requirements. Tangential? Yeah, it's tenuously... Are you saying tangential meaning they don't do it? No, I'm saying it's tenuously linked to those activities. Explain that a little bit more to me, please. Well, it's the same as any... For instance, Your Honor, any activity that a police officer deals with at work may be mandatory in nature. They're required to show up at a certain time. They're required to wear a uniform. They're required to fill out paperwork. They're required to do a lot of things. And so that mandatory nature in and of itself does not create a special risk. In addition, in this case, there is no evidence demonstrating that the mandatory nature, even if the court were to find that it was mandatory, contributed in any way to making this more risky than an average person choosing to work out. And as the court in... Excuse me. So does it have to be mandatory to be a special risk? No. Okay, so then put the mandatory aside, then. And my point is that this is not a special risk because this is something that ordinary citizens in their ordinary walks of life undertake. Thousands of people every day lift weights, probably millions. I obviously could do a little more, right? But the reality is this court, for instance, in White and in Fedorsky, both took into consideration non-occupational tasks that people engage in in order to determine whether or not there is a special risk. So, for instance, in White, you have somebody who got out of their car to go serve a parking ticket on somebody. Now, is that an activity that normal citizens don't do? Generally, no. But this court said, look, getting out of your car and walking across and leaving a note is something that's very commonly done. Now, that's maybe not a professional activity, but it is something that is engaged in by routine citizens. There is no special risk there. Similarly, this court held in Fedorsky. You had an evidence technician that had gathered evidence of a crime, was in the process of maintaining the chain of custody on that evidence, transporting it back to the police station. He was sitting as a passenger in the vehicle, and then he got into a car accident. Now, do average citizens, are they required to maintain the custody of evidence? No. But what they found is that, look, lots of people at their job and not at their job riding cars with other people. That being a passenger in a vehicle does not turn you into a special risk. Similarly to this case, thousands if not millions of people every day work out. Some people warm up. Some people don't. Some people's bosses give them time at work to be able to work out. Others don't. There is no special risk here that is specifically related to lifting weights. Moreover, there's nothing in the record that demonstrates that the mandatory nature, if there was one, created some special risk. So, Justice Enoff, with all of that, there's definitely a demonstration here that this is an activity that is routinely engaged in by citizens, mandatory or not, and that there was no special risk. There is no medical evidence in the record demonstrating that this amount of weight, or the manner in which the test was administered, created a risk different than a person who chooses to go to L.A. Fitness and work out or any other facility. A lot of the cases that find that there to be an active duty are activities routinely engaged in by people. I mean, an activist driving a car. Rose driving a car. Alan riding a bicep. But the issue in those cases was the capacity. If you're on patrol, it raises it to a different level, the capacity in which you're doing those normal activities. Now, here, as counsel argues, the capacity in which this officer was doing that normal activity that millions of people do, and I understand that, was a training exercise. I don't believe it was a training exercise. That's what he's equating it to. If somebody shot him on the range doing shooting, maybe it wouldn't be that close of a case. I don't know. I don't know either, but if there was some type of a true training exercise and someone was injured, it might not be as close of a case. So is this a training exercise or isn't it? I don't believe it is. I believe that it's a qualification. It's a fitness for duty, if anything else, which is routinely done by other occupations, relating somehow to whatever that occupation may be. Now, if you demonstrate or act erratically, certain regulatory bodies may ask you or I to go have some sort of fitness for duty administered on us. It's done in every occupation, determining whether or not somebody's able to do work. Getting into the minutiae of how management chooses to be able to do that, especially in light of the fact that the people representing Officer Svoboda agreed to that in their collective bargaining agreement, demonstrates that this is not very different than other situations where people are required to prove their ability to continue to do their job. What's the difference between fitness for duty and a training exercise? Well, a training exercise prepares you for opportunities going forward. This is not preparation. In fact, Mr. Mielke does an excellent job of developing a record, or at least his argument relating to that, that this was not preparation. This was not preparing to go out and fight bad guys on the street. This is not preparing to go out and be able to subdue an unruly subject. This is just making sure that a person is able to do the minimum functions of a police officer, that in the end, is Officer Svoboda fit to go out and do their job? Is he competent? And measuring competence, making sure of competence, ensuring competence is something that is part of any act. And as Justice Berger made a very good point of, the nature of the act is the focus, not the actual physical act itself. And I certainly concur with you. And because of that, there's nothing unique about this situation to police work. And certainly, to the extent that there may be something different about it, is a level of parsing that then would eliminate active duty. It is unique that people have to maintain custody of evidence. And that was the nature of the act that that officer was engaged in. But there was no special risk that normal citizens engage in. So it's more than one. Active duty isn't just showing special risk. You have to show that it's a risk that they're engaging in, that ordinary citizens in the ordinary walks of life, which is not just an occupation, engage in. And routinely, citizens choose to work out. And there's no evidence in the record showing that the mandatory nature of this test, if it were mandatory, is in any way creating a special risk. There's no evidence. So your argument is that your training exercise versus fitness evaluation argument is that if he's on the firing range qualifying and gets injured, then it's probably not an active duty. I don't know. There's a lot of factual distinctions there. Do a lot of Americans go out and shoot at a firing range? Yes. Are you running around and shooting a combat force versus regular behind a silhouette? There's so many different factual distinctions there that it's really difficult to answer your question. But, yes, are there circumstances where a board reasonably could conclude? I'm sure I could imagine some. But I don't know. But the case before us here is much more clear-cut. There are many more people who every day lift weights or routinely lift weights that are injured than there are people probably hurt at firing ranges. But if those distinctions were meant to be drawn, the record could have been developed by the person with the burden of proving those things. And so what the pension board largely held in this case is that the plaintiff did not meet his burden because he did not show there's a special risk not encountered by ordinary members of the public. Why is the standard of review not de novo? The reason the standard of review is not de novo is because we've been standing up here arguing about whether or not the test was mandatory. That in and of itself shows that this is not just a question of law. So you're saying there's a dispute as to the facts or that one fact? There are some disputes of the facts in this case. We argue about it. And largely, many of those disputes come out of the fact that there's an undeveloped record about things that the plaintiff may have wanted to put in to be able to support their position. Is there not a combination that is a question of law and a question of fact? I think that the court reasonably could conclude that the clearly erroneous standard applies. We run into problems, though, when we don't have a finding by the board and then we're trying to, you know, do a manifest wait based upon giving the board deferences to their factual findings when they don't make the factual findings, at least on certain issues. I mean, you say we're arguing about the mandatory nature. They didn't make a finding about that. How are we giving deference to that? We're just to search the record or we can search the record for reasons to affirm, but I don't know that we can give them deference for something they didn't do. I understand your position there. I think at the same time, though, Your Honor, the only reason we would have the argument about the mandatory nature is if you get past my first argument, which is that's irrelevant. Right. Which is special risk, which they did tackle. And why isn't this like Aum and a bunch of other cases where the facts are undisputed as it goes to special risk? I mean, the board made a finding. There's no special risk here. So as it relates to special risk, isn't this a de novo review? No. Summers. And I mean, there's how many of these cases that White, Sarkis, Alden, Oval. There are several others where you also apply preliminary erroneous under similar circumstances, because I don't think that the sole issue here on standard of review is the sole issue before the court is the special risk issue alone. It's the whole issue of active duty and ordinary walks of life. For instance, we have a factual argument about whether or not people are in the ordinary walks of life. And counsel asks you to take judicial notice of things that were not developed in the record by the person who had the burden to do so. And because of that, there are factual issues that are inextricably intertwined with the standard of review. In the end, though, your honor, under any standard, I believe that the pension board should be affirmed in this decision. Thank you for your time. Is there anything you do want to add? Thank you. I heard I did a bad job at the hearing because I didn't put in evidence of a special risk. I suppose I could have hired Joe Del Monte from Volcamona. You may or may not know that name. He's an overused expert, vocational expert in workers' compensation matters that could have answered all of Mr. Carlson's questions. But we don't do that in these proceedings. We set up all the facts, and then we apply our common sense to them to determine whether or not there was a special risk. That's what all the cases tell us. We pretty much have talked about this, but a lot of people exercise without warming up because there is this body that says you shouldn't warm up. You should warm up afterwards. Another body says you should warm up before. People get hurt all the time. The one thing, though, that's standing out here is 75 percent of one's body weight. Now, where does that come from? And wouldn't that have been— In this case, where did it come from? Let me determine this case and let me add something. And would it not have made sense to find someone who would indicate that that is either regular or it's a little unusual? Well, where does it come from, first of all? In the record, there's a series of e-mails, and the bench press is just part of it, the larger test. And I think it's important to maybe take a look at the larger test, too. It's consisting of running a mile and a half at a certain time, then running 300 meters in a certain time, then doing 28 sit-ups in a certain time, and then bench pressing 75 percent of your body weight. There is no location in the universe that has those requirements other than police officers and probably firemen. For some reason, there's a tradition of putting policemen and firemen through these annual fitness exams, although I think the reality is the smarter municipalities don't do it because they injure people needlessly. But this is unique to police. And the testimony in the case is that the bench press component is to mimic the power test. And the power test is a known term in police vocabulary, and it's what's done at the academy. To get out of the academy, you have to bench press 75 percent of your body weight. That's what police officers do. Well, usually when you're getting out of the academy, you're a little younger. Yes. And the officer here has been on this force for six years, about six at the time of his injury. We don't know from this record had he been anyplace else before he came out of the academy. But he's a young man. But, you know, we're talking about younger people than most of us here in this room. Yeah, we represent the Aurora Union, the Belgian Union, the Rockford Union. I would say the majority of those officers couldn't pass this test. So while it's to mimic the power test, as you say, it still doesn't make sense why we don't know what the criteria is. And it seems from looking at maybe the chief's criteria, you know, you've got to be able to literally throw around somebody if need be who's half your weight, 75 percent of your weight, 125 percent of your weight. The nature of police work would be sitting around literally doing nothing, smoking a cigarette, eating donuts, waiting for a radio call. That's what they do. And then you go from zero to full speed in a matter of seconds when you're in a death struggle with someone often younger than you are, someone who's typically got a total adrenaline rush maybe amplified by drugs going, and then an officer, whether they're younger or older, they're in literally a death struggle with some young thug who's hopped up on drugs. And that's why these requirements, I think, are unique to police officers, because no one other than police officers are required to do that type of thing. I don't think we're here to change how we try police pension hearings and force people to start bringing in experts. I suppose we could do it, but it doesn't seem to me. I've never seen it done. There's no Illinois appellate case that says it was necessary or even comments on it having been done. So the totality of the facts are in the evidence, and I think when we apply our common sense to that totality and then read the provisions of the pension code, the conclusion is that this officer was indeed injured in the line of duty, and I would agree it should be a de novo standard of review here because the facts are undisputed. Well, what about the aspect of mandatory? I mean, there's no finding. The best thing I can point out, and this is on page five of my reply brief, Sergeant Barnum did a report to the chief, the supervisor's investigation report, and I think this is done four days after the incident, quote, officers were both participating in the mandatory fitness test and injured his shoulder during the bench press, close quote. I don't know what else you can say. I think the Village of Sugar Grove doesn't have to do a fitness test. It's not mandatory for the Village of Sugar Grove to do the test. The CBA, the collective bargaining agreement, gives them the option. Once they decide to do it, as they did here, it's mandatory for the police officer to participate and try to pass the test. Thank you. Thank you. All right, thank you, counsel, for your arguments this morning. We will take the matter under advisement and we will issue a decision in due course. We are going to stand in recess.